# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 26, 2023 Session[1]

## STATE OF TENNESSEE v. ROBERT L. CODY, III

**Appeal from the Criminal Court for Knox County**
**No. 114935   Kyle A. Hixson, Criminal Court Judge**

_____

### No. E2022-00947-CCA-R3-CD
_____

Defendant, Robert L. Cody, III, was convicted of conspiracy to possess 26 grams or more of cocaine with intent to sell within 1,000 feet of a drug-free zone (count one); possession of a firearm with intent to go armed during the commission of a dangerous felony (count two); possession of a firearm by a convicted felon (count three); and the jury found that Defendant committed a criminal gang offense (count ten) enhancing count one to a Class A felony.  The trial court imposed an effective thirty-three year sentence to be served in the Department of Correction.  On appeal, Defendant argues: (1) that the trial court erred by denying his motion to dismiss counts two and three for failure to charge an offense, and count ten of the presentment for failure to give proper notice of the gang enhancement; (2) that the trial court erred by failing to declare a mistrial after the State read the presentment to the jury; (3) that the trial court erred by excluding Investigator Jinks from the Rule of Sequestration; (4) that the trial court erred by admitting text messages that were not properly authenticated; (5) that the evidence was insufficient to support Defendant's drug conspiracy conviction in count one; (6) that the criminal gang enhancement violated double jeopardy and the doctrine of collateral estoppel; (7) that the trial court erred in sentencing Defendant under the prior version of the Drug-Free Zone Act; and (8) that this court should resentence Defendant under the 2022 amendments to the Drug-Free Zone Act.  Following our review of the entire record, oral arguments, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Jackson Fenner, Knoxville, Tennessee, for the appellant, Robert L. Cody, III.

---

[1] Oral argument was heard in this case at the University of Tennessee College of Law in Knoxville, Knox County, Tennessee.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme Allen, District Attorney General; and TaKisha Fitzgerald and Larry Dillon, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

This case relates to a criminal investigation involving three residential searches and one traffic stop resulting in the recovery of drugs, drug paraphernalia, currency, weapons and ammunition. Defendant, along with co-defendants Raffell "Satti Ru" Griffin, Sidarius "Rick" Jackson, Decosio "Cozy" Clark, Thakelyn "Earz" Tate, Zephaniah "Zeph" Nyane, Terry "Tree Top" Thomas, Charles "Carolina" Arnold, Robert Crowe, Lola "Kisha" Garrett, and Tony Smith were charged in a twelve-count presentment for crimes committed in furtherance of a drug conspiracy occurring between September 1, 2017, and September 30, 2018. Specifically, Defendant was charged with conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver within 1,000 feet of a drug-free zone (count one), employment of a firearm during the commission of a dangerous felony (count two), engaging in an enterprise of racketeering activity (counts four and five), and that the conspiracy charge was subject to the criminal gang enhancement statute (count ten). The two racketeering counts were dismissed prior to trial.

*Trial*

Charles Arnold testified that he lived in the Walter P. Taylor Homes from 2013 until 2017, and developed an addiction to crack cocaine. At some point, Defendant approached Mr. Arnold and asked to use his apartment to sell drugs, and Mr. Arnold agreed. Mr. Arnold testified that he received "maybe a gram or two" of cocaine daily in exchange for allowing Defendant to use his apartment. Mr. Arnold testified that this went on for approximately six months until police came and searched his apartment in September of 2017. Investigators found .44 grams of crack cocaine on a plate with a razor blade, and drug paraphernalia consisting of plates, razor blades, a "pot smoking device," sandwich bags, and multiple scales, including one scale that was sitting on the microwave. They also found a .22 caliber pistol and several boxes of ammunition for other types of guns. Mr. Arnold denied that any of the items belonged to him.

Mr. Arnold testified that police came back to his apartment a second time on December 12, 2017, and found additional drugs, drug paraphernalia, guns, ammunition, and money which again did not belong to him. This included a rifle in a closet with a fully loaded drum magazine, along with a bag that could hold up to fifty rounds of bullets. There were scales, a "pot smoking device," and forms of identification lying on a table. On another table in front of the television, investigators discovered a fully loaded Taurus nine-

millimeter pistol, a large stack of cash, scales, and 29.13 grams of powder cocaine. There was additional cash and a plate with a razor blade on the floor. Police photographed several people inside the apartment, including one man who was sitting in front of a table with marijuana on it. There were live rounds of ammunition and a box of ammunition inside of a large bag. A dresser drawer contained a box of sandwich bags, a plastic bag with 33.41 grams of crack cocaine, and razor blades. There were also measuring utensils and a whisk in the kitchen.

Mr. Arnold said that Defendant and Mr. Tate were selling drugs out of the apartment when the two searches were conducted. He acknowledged that he was arrested in this case and received a plea offer from the State for misdemeanor simple possession.

Officer Clayton Madison of the Knoxville Police Department ("KPD") testified that on January 18, 2018, he was looking for co-defendants Decasio Clark and Sidarious Jackson on Dry Gap Pike in Knoxville. He and other officers pulled over a vehicle in which Mr. Clark and Mr. Jackson were passengers; two other individuals were also in the vehicle. Officer Madison testified that two backpacks were found in the vehicle, both containing handguns. He also saw "other firearms." The officers recovered 76.12 grams of powder cocaine, 4.57 grams of crack cocaine, and digital scales from the vehicle. Investigators interviewed Mr. Clark and Mr. Jackson and searched their cell phones.

Investigator Diondre Jackson of the KPD Organized Crime Unit and Narcotics, testified that he was familiar with co-defendant Zephaniah Nyane, who was on state probation and lived on Louise Avenue. On May 15, 2018, Investigator Jackson and his partner conducted a probation/parole search at Mr. Nyane's residence. They recovered a cell phone, an assault rifle, and several types of ammunition.

Robert Crowe testified that he had lived at his residence on Louise Avenue for thirty years with his wife until she passed away in 2014. He knew Defendant as "Ville." Mr. Crowe testified that he began using cocaine when his wife got sick because he was "trying to relax or whatever you want to call it." After his wife died, Mr. Crowe met Lola Garrett, and she, along with Tony Smith, eventually moved in with him.

Mr. Crowe testified that he met Defendant when Ms. Garrett asked if Defendant could "come by and post up." He thought that Defendant would be there for one day, "but it went on 24/7." He said that Defendant was "all over. He just took over." Mr. Crowe testified that Defendant sat at the table and sold cocaine and marijuana out of Mr. Crowe's house, "and if we'd run out [of cocaine] he would go to the microwave and cook it." He noted that this occurred daily, and Defendant would break off a piece of the cocaine for Mr. Crowe, usually worth approximately fifty dollars. Mr. Crowe testified that Ms. Garrett and Mr. Smith, along with Thakelyn Tate and Sidarius Jackson, also sold drugs from his home. He said that Defendant gave all three of them packs of cocaine to sell. Mr. Crowe

noted that his role was to sit by the door and direct the people coming to purchase drugs to Defendant.

Mr. Crowe testified that police searched his house in June of 2018 and took photographs. He was also charged with conspiracy, and he received an offer to plead guilty to simple possession. Mr. Crowe testified that he observed guns in his house daily and that Defendant always had a nine-millimeter handgun on the table while he was selling drugs. Mr. Crowe testified that Mr. Tate also had a gun and that on one occasion, someone "shot up" Mr. Crowe's house, and Mr. Tate returned fire through the door. He agreed that the guns were used to protect the drugs.

Lola Garrett testified that she became addicted to crack cocaine as a teenager and met Defendant at the Walter P. Taylor Homes; she knew him as "Ville." She moved in with Mr. Crowe on Louise Avenue at some point, and she also met Tony Smith in the neighborhood. Ms. Garrett testified that she saw Defendant on the street one day, and he asked her about selling crack cocaine out of Mr. Crowe's residence. She said that she and Mr. Smith sold crack and that she saw Defendant cook the crack cocaine there and sell it. Ms. Garrett testified that Mr. Jackson, Mr. Clark, "Ralph," Mr. Tate, and Mr. Nyane also sold crack cocaine out of Mr. Crowe's house. However, when Defendant was there, "everybody came to him." Ms. Garrett testified that she saw firearms lying on tables in the residence, and she thought there had been three drive-by shootings there. She was present during one of the shootings and thought it occurred before she was taken to jail in May of 2018. Ms. Garrett also identified photographs of several other individuals whom she had seen selling crack cocaine at Mr. Crowe's residence. She acknowledged that although she was charged in the conspiracy, she pled guilty on the morning of trial to misdemeanor simple possession.

Investigator Philip Jinks of the KPD testified as an expert in narcotics and gang investigations. He identified photographs of Defendant and the other co-defendants. Investigator Jinks testified that he became familiar with the individuals when he responded to a call at Mr. Arnold's apartment on December 12, 2017, to assist the Organized Crime Unit. Mr. Arnold had consented to a search of his apartment which yielded powder cocaine, crack cocaine, cash, ammunition, and guns "essentially laying around everywhere." Investigator Jinks noted in particular a "Draco-type, style, assault rifle" found in a closet in the bedroom. He said: "Drugs and guns go hand-in-hand. Firearms are used by drug distributors to protect themselves mostly from robbery. It's a violent business." He further testified that "it's common in these cases for distributors and manufacturers to utilize the residence of addicts to ply their wears [sic], to manufacture and distribute these substances."

Investigator Jinks testified that three sets of digital scales were found in the residence and that digital scales are "frequently used to weigh controlled substances during the manufacture and distribution process" and are the "most accurate way to weigh the

- 4 -

substance after it's - - after the manufacture and before it's distributed." There was also a crack pipe, razor blades, and sandwich bags. Investigator Jinks explained that the "most common way crack cocaine is packaged after it's manufactured, after it's cut up, ready for distribution is in plastic sandwich bags. Usually what happens is the crack cocaine or the controlled substance, any controlled substance will be placed in these sandwich bags." Investigator Jinks testified that there were whisks, measuring glasses with what appeared to be cocaine powder residue, and some other items frequently used in the process of manufacturing crack cocaine.

Investigator Jinks later interviewed Sidarious Jackson after the traffic stop and seized currency and Mr. Jackson's cell phone. Investigator Jinks "felt that the money that [Mr. Jackson] had was more likely than not proceeds of drug sales." Investigator Jinks also testified that the quantity of cocaine recovered from the car during the stop "was certainly consistent with manufacture and distribution."

Investigator Jinks testified that he was certified by Cellebrite to use a program called "Physical Analyzer" to extract data from cell phones and translate it into an "easily navigable, readable format." He had received "multiple trainings" and "through his experience" learned "that a lot of that data has to be analyzed with an eye of - - understanding that drug distributors and drug traffic organizations use coded language." Investigator Jinks testified that he obtained a search warrant and downloaded information from three cell phones taken from Defendant during traffic stops on three different dates in 2018. He also examined phones from Mr. Tate, Mr. Clark, Mr. Jackson, Mr. Nyane, and Mr. Thomas.

Investigator Jinks testified that he also had training in gang investigations and was familiar with the "Tree Top Pirus" gang, a "subset of the Bloods criminal street gang." He had investigated the gang and identified certain members. Investigator Jinks noted that Defendant and other individuals involved in this case, except for Mr. Arnold, Mr. Crowe, Ms. Garrett, and Mr. Smith, were members of the gang. He said that gangs use a special language sometimes that is "both verbal and in written communication that is specific to certain gangs." Investigator Jinks testified that the coded language was prevalent throughout certain text messages extracted from the phones. He said that Mr. Arnold's apartment was a "trap house," which is "a house or residence that's used primarily for the manufacture and distribution of controlled substances. It's a place where people go to sell drugs; it's a place where people go to buy drugs." Investigator Jinks testified that based on Ms. Garrett's testimony, Mr. Crowe's house was also a trap house.

Investigator Jinks identified messages from September 11, 2017, to November 1, 2017, exchanged between Defendant and other individuals, including someone called "Lavy." In the messages, Defendant used coded language specific to the Tree Top Pirus gang. In one text message exchange on September 11, 2017, the sender asked Defendant for an eighth of an ounce of powder cocaine and was quoted a price of $175. During a

conversation on September 15, 2017, Lavy referenced Mr. Arnold's apartment. On October 4, 2017, there was a conversation between Lavy and Defendant about money that Lavy owed Defendant and that Defendant was trying to get money together to pay his supplier. Defendant indicated that he had fronted Lavy a little less than two ounces of a controlled substance to sell, and Lavy had paid him $1,000 but still owed $300. On October 10, 2017, Defendant indicated in a text message that he was at Mr. Arnold's apartment. On November 1, 2017, Defendant sent a text asking Lavy to "[b]ring the FN," which was a particular brand of firearm, because Defendant was unarmed, and Lavy agreed to bring it to him at "Da trap."

Defendant's phone contained text messages exchanged between Defendant and Raffell Griffin between September 27, 2017, and December 2, 2017. In the messages, Defendant and Mr. Griffin used language specific to the Tree Top Pirus gang. During one exchange, Mr. Griffin asked Defendant's location, and he replied that he was in "da spot." The following day, Defendant sent a text message to Mr. Griffin stating that he was at "Da trap."

Investigator Jinks identified a text message exchange between Defendant and Mr. Griffin concerning a firearm that Defendant agreed to get from home and drop off in the "hood," and Mr. Griffin's mother would "put it up." Investigator Jinks testified that during a text message exchange on October 19, 2017, Mr. Griffin and Defendant discussed processing one-half ounce of powder cocaine, which is a little more than 14 grams of cocaine, into 12 grams of crack cocaine. Investigator Jinks testified that the two men discussed "[w]hipping it" which means using a whisk and "adding more bi-product, adding more baking soda, more cutting agents, more product that will increase your yield but will decrease the potency of the crack cocaine." Defendant indicated that he used the "drop" method in the manufacture process rather than whipping. Defendant and Mr. Griffin then discussed getting someone else to whip the cocaine. On October 21, 2017, Mr. Griffin asked Defendant if he had more powder cocaine, and Defendant answered affirmatively. Mr. Griffin then told Defendant that he had scales at his mother's house. Later that night, Mr. Griffin asked if Defendant was "still in the trap," and Defendant responded, "Yea." Investigator Jinks testified that on November 2, 2017, Mr. Griffin texted Defendant and asked his whereabouts, and Defendant said that he was again at "Da trap." Mr. Griffin requested a "half" and said that he was "coming out" or "coming through."

Investigator Jinks identified another text message exchange between Defendant and Mr. Griffin which he interpreted as Mr. Griffin's asking Defendant if he had any powder cocaine, and Defendant's negative response. Investigator Jinks testified that during a text message exchange on December 2, 2017, Defendant asked Mr. Griffin to pick up a Draco assault weapon. Mr. Griffin later said that he was "[p]ulling up down the street" and asked if Defendant was "in there." Investigator Jinks noted that Mr. Arnold's apartment was "raided" on December 12, 2017, and a Draco assault rifle was recovered.

Investigator Jinks also identified text messages exchanged between Defendant and Thakelyn Tate[2] between October 19, 2017, and December 13, 2017. On October 19, 2017, Defendant sent a text message to Mr. Tate indicating that Defendant was attempting to retrieve a "cookie" that had fallen behind the sink. Investigator Jinks testified that this would be a "cookie of crack cocaine," which is a "finished product of crack cocaine." In response to a later text from Mr. Tate asking Defendant's whereabouts, Defendant indicated that he was in the parking lot of Mr. Arnold's apartment complex. Mr. Tate replied: "It's like $1,500 in here."

On November 3, 2017, Mr. Tate sent a text message with an attached photograph of Defendant in Mr. Arnold's apartment. The photograph showed a yellow box of sandwich bags, which was consistent with what Investigator Jinks observed at the apartment during the search. Defendant sent Mr. Tate a text on November 17, 2017, stating that he needed "some work." Investigator Jinks testified that "work is a very common term used to refer to usually cocaine, but really any controlled substance other than marijuana, when it's being used for distribution." He further stated: "So 'I need some work' would be I need some dope or cocaine." Investigator Jinks testified as follows concerning the conversation between Defendant and Mr. Tate:

> It's a very long conversation but the gist of it is [Defendant] is asking [Mr. Tate] or telling him that he needs some work. [Mr. Tate] asked, "Do you want me to call my guy" or my source. To which [Mr. Tate] says yes - - or to which [Defendant] says yes and explained what he wants to or for depending on whatever the circumstances were.
>
> The response is that - - from [Mr. Tate] is that he can do two for 975 a piece. That would be consistent with an ounce of cocaine, $975.

Mr. Tate indicated to Defendant that the source said the drug was "A1," meaning that it was of high quality. Defendant and Mr. Tate then discussed each other's location and where they should meet to make the drug buy. They later discussed that one ounce of cocaine purchased was the correct amount of 28 grams, and the second ounce was only 21 grams. Investigator Jinks testified that Mr. Tate indicated that he went back and got more of the drug, "a lot more."

Investigator Jinks testified that during a text message exchange on November 26, 2017, Defendant told Mr. Tate that he was at the "trap" and needed one ounce of cocaine. Mr. Tate indicated that he had called a supplier, "NJ," but the call went to voice mail. He and Defendant also discussed the price charged by NJ and the quality of the powder cocaine. Defendant and Mr. Tate later discussed meeting the supplier and the amount of

---

[2] He was identified in Defendant's phone as Earz Johnson.

crack cocaine that was produced after the manufacturing process of the purchased cocaine powder was complete.

Investigator Jinks testified that on December 12, 2017, on the day of the search of Mr. Arnold's apartment and his arrest, Defendant and Mr. Tate exchanged text messages about whether anyone had posted videos or pictures from inside the residence that day. Defendant later indicated that one picture showed him inside the apartment, and Mr. Tate replied, "It's gone." There was a message containing a booking photograph of a female who was arrested at the residence. Defendant indicated that he checked to see if he had an outstanding warrant but did not find anything, and they also discussed not helping Mr. Arnold post bond.

Investigator Jinks testified concerning text messages exchanged between Defendant and an unidentified individual on June 17, 2018, which indicated that Defendant was asking if someone named "Gino" had a half ounce of powder cocaine. Investigator Jinks testified that individuals in drug conspiracies frequently "develop different and new sources of supply that can provide product for cheaper or better product and will change horses in mid-stream. They start going to different sources of supply and being with other people."

In addition to the text messages, Investigator Jinks also retrieved pictures and videos from the three cell phones depicting Defendant and his co-conspirators at Mr. Arnold's apartment and Mr. Crowe's house with weapons and large sums of currency. In one video, dated December 12, 2017, Defendant appears in Mr. Arnold's apartment sitting in a chair "directly in front of that table and TV" where powder cocaine and a nine-millimeter handgun were found later that day during the search. Investigator Jinks also identified four videos taken between January 25, 2018, and March 2, 2018, showing Defendant at Mr. Crowe's residence.

Based upon his training, experience, and review of the evidence, Investigator Jinks concluded that the crack cocaine seized in this case "was being possessed with intent to distribute it, to sell and deliver it, and I believe that the powder cocaine was being possessed with intent to manufacture it into crack cocaine for further distribution." He further testified as to his belief "that there was a conspiracy among the Tree Top Piru[s] to include [Defendant] and other individuals that I don't know to distribute crack cocaine here in Knox County" in an amount 26 grams or more within 1,000 feet of a drug-free zone.

On cross-examination, Investigator Jinks agreed that approximately 70 grams of cocaine was seized during a traffic stop on Dry Gap Pike involving Mr. Clark and Mr. Jackson. He was unable to determine the source of the drugs. Cocaine was also seized from Mr. Arnold's apartment on December 12, 2017. Investigator Jinks agreed that no drugs were found on Defendant at any time and that there were no photographs of Defendant holding a weapon. There was a video of Defendant seated in a chair with a gun

in the foreground. Investigator Jinks agreed that he could not say for certain who sent the text messages from Defendant's phone.

Donna Roach, an employee of the Knoxville Utility Board Geographic Information System, created a map with a "thousand-foot buffer" around Mr. Arnold's apartment on McConnell Street showing parks, daycare centers, and schools. Ms. Roach marked the Boys and Girls Club with the "recreation center buffer around it." She also created a map with a "thousand-foot buffer" around Mr. Crowe's residence on Louise Avenue "which has a day care and park buffers within that thousand-foot area."

The jury convicted Defendant of conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver within 1,000 feet of a drug-free zone (count one) and found that the co-conspirators took several overt acts in furtherance of the conspiracy. In considering count one, the verdict form asked the jury to determine if one or more co-conspirators was affiliated with the Tree Top Pirus gang; the jury marked "No" on the form. The jury also found that Mr. Crowe's house was not used to "house" cocaine, but that Mr. Arnold's residence was used for that purpose. The jury also convicted Defendant of the lesser-included offense of possession of a firearm with intent to go armed during the commission of a dangerous felony (count two).

*Bifurcated Proceeding*

In a bifurcated proceeding to determine whether Defendant had a prior felony conviction and concerning the applicability of the criminal gang enhancement statute, Investigator Jinks testified that Defendant's cell phone and those of the other co-conspirators contained information that assisted him in determining that they were members of the Tree Top Pirus gang. He said there is a rank structure within the Tree Top Pirus: "An OG would be considered kind of a higher rank. That stands for Original Gangster. And then below that would be an OYG, which is Original Young Gangster, and then a YG would be a Young Gangster." Investigator Jinks testified that information from Defendant's phone indicated that Defendant's nickname was "Ville," and he was an "Original Young Gangster" within the Tree Top Pirus gang. Investigator Jinks said that the gang is nationwide and originated in California. Defendant's phone showed that he had communications with an "Original Gangster" located in California called "OG Kenzo." Investigator Jinks interpreted the messages as stating that it was Defendant's responsibility to disseminate information to other gang members due to Defendant's "rank status."

There was also a text message exchange between Defendant and Mr. Griffin in which Mr. Griffin said: "Please shoot somebody. I'll shoot whoever you point out. I'm tired of MF's sleeping on the gang." Defendant replied: "On everything" which Investigator Jinks interpreted as meaning that Mr. Griffin was tired of other gang members not "taking care of business." Defendant's phone also contained photographs and videos of other individuals involved in the conspiracy. Investigator Jinks reiterated that based

upon his training and experience, Mr. Tate, Mr. Jackson, Mr. Clark, Mr. Griffin, Mr. Nyane, and Defendant were all members of the Tree Top Pirus gang during the time of the conspiracy in this case.

On cross-examination, Investigator Jinks agreed that not all criminal conspiracies are gang related. He said that Defendant never admitted to him that he was involved in a gang, and he was not identified by an informant or anyone else as being involved in a gang. Investigator Jinks based his opinion that Defendant was a criminal gang member on physical evidence such as photographs with other gang members, that Defendant frequents a gang area, and he "adopts their style of dress, hand signs, or tattoos[.]" Investigator Jinks further testified:

> There were multiple photographs where [Defendant] and other individuals were wearing red which is a primary color of the Bloods adopted by the Tree Top Piru[s] and more specifically a baseball cap that says 400 Spruce. That would be indicative of style of dress. This is the 400 Spruce Street Tree Top Piru[s].

As for the hand signs shown in the videos on Defendant's phone, Investigator Jinks explained:

> Some of them are pretty self-explanatory with the 4 representing the 400s, which oftentimes the Tree Top Piru[s] refer to themselves or are referred to as 400s. There were other, more Blood-centered gang signs. I don't recall exactly which ones. I would have to refer to the photographs and the videos to be more specific.

Stephanie Ogle, Office Supervisor for the Criminal Court for Knox County, identified Defendant's judgment of conviction dated August 4, 2011, for the manufacture, delivery, sale or possession of a Schedule VI controlled substance identified as marijuana. Ms. Ogle also identified judgments of conviction for various gang-related criminal offenses committed by other individuals named in the gang enhancement count of the presentment.

Investigator Mark Taylor of the KPD Organized Crime Gang Intelligence Unit, testified as an expert in the field of gang investigations and gang identification. He reviewed files on the co-defendants in this case and testified during their trials. Investigator Taylor had reviewed the Knox County Sheriff's Office gang lists, which are individuals recognized by law enforcement and certified as criminal gang members. He also used the sheriff's office reporting system that consisted of police reports, field interviews, and other documentation, and the Tennessee Offender Management Information System ("TOMIS"), which has a security threat group section. Investigator Taylor concluded that all individuals named in the gang enhancement of the presentment were affiliated with the Tree Top Pirus gang.

As for Defendant, Investigator Taylor reviewed Defendant's "gang file" from the sheriff's office which reflected that Defendant had "branding or tattooing, admitted membership, associates, correspondence, use of colors, arrested for violent crime, [and] felony criminal history." Investigator Taylor testified that "one of the significant things that stands out is going to be [Defendant's] - - about his neck level are the letters 400 and below that part is the word 'Spruce.'" Investigator Taylor noted that the Tree Top Pirus gang originated at 400 Spruce Street in Compton, California. Defendant also had a tattoo on his back with what appeared to be "Taylor Homes and the State of Tennessee, outline of Tennessee[,]" and on his left arm, there were the initials FTW and what appeared to be a Draco AK-47 pistol. Investigator Taylor testified that the "Tree Top Pirus use Taylor Homes. Taylor Homes is Walter P. Taylor Homes, and that is their territory or their main - - that's kind of the center of their area or their turf." He further testified: "The Draco is like their war weapon, it's - - for lack of a better term" and used to intimidate, retaliate, or protect their turf.

Investigator Taylor had seen videos and photographs of Defendant, Mr. Jackson, Mr. Griffin, and other members of the conspiracy together using hand signs consistent with those of the Tree Top Pirus gang. He said that Defendant's charges in this case consisting of narcotics trafficking, drug conspiracy, and weapons used in facilitating a dangerous felony were consistent with the furtherance, advancement, or maintenance of a gang. Concerning Defendant's involvement in the Tree Top Pirus gang, Investigator Taylor concluded that Defendant was a "very high ranking member or a leader if not the top leader, one of the top leaders."

Investigator Thomas Thurman of the KPD interviewed Defendant on May 8, 2018. Defendant waived his *Miranda* rights and admitted that he was a member of the Tree Top Pirus gang and "had been a member of that gang for quite some time. Longer in duration than probably anybody else in the area." Defendant also said his status in the gang was "OG" or Original Gangster.

The jury found that Defendant had a prior felony conviction which supported a conviction in count three for possession of a firearm by a convicted felon, that Defendant was knowingly a member of the Tree Top Pirus gang during the commission of count one supporting his conviction in count ten, and that the criminal gang enhancement should apply to count one, enhancing the conviction to a Class A felony.

*Sentencing Hearing*

The presentence report, a certified copy of Defendant's January 22, 2013 federal conviction for "felon in possession of a firearm," a certified copy of his September 26, 2019 federal conviction for "escape from custody," and certified copies of two agreed orders of revocation of supervised release for his federal convictions dated April 1, 2016,

- 11 -

and July 9, 2018, were introduced as exhibits at the sentencing hearing. Neither the State nor Defendant put on any further proof.

The trial court noted that Defendant's conviction for conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver within 1,000 feet of a drug-free zone increased from a Class B to a Class A felony due to the "jury's finding and application of the criminal gang enhancement." For those reasons, Defendant faced a sentencing range of fifteen to twenty-five years. The court further noted "that is when the application of the drug-free zone act kicks in." As to count one, the State conceded that Defendant was a Range I, standard offender, and the trial court found him to be a Range II, multiple offender "in [c]ount [two] as enhanced by [c]ount [three]."

The trial court found that the following enhancement factors applied to the Defendant's convictions: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;" (2) "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors;" (8) "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;" and (13) at the time the felony was committed, Defendant was "[o]n some form of judicially ordered release." T.C.A. § 40-35-114(1), (2), (8), and (13)(F). The trial court gave factors (1), (2), and (8) great weight and noted that factor (1) only applied to counts two and three of the presentment. The trial court found that no mitigating factors were applicable.

As to the manner of service, the trial court found that Defendant had a long history of criminal conduct and that confinement was necessary to avoid depreciating the seriousness of the offense. *Id.* § 40-35-103(1)(A-B). The court noted that "[t]his was a long-running conspiracy," and

> [t]he cocaine that was actually confiscated by police was voluminous, but you can only imagine the amount of cocaine that was actually at play here based upon how long this conspiracy was ongoing and based upon the testimony that we've heard regarding how it was something that was happening just every single day at one of these trap houses, either the one in Walter P. or the other one that was at the house.

The trial court found that confinement in this case was particularly suited to provide an effective deterrence to others likely to commit similar offenses and considered the necessary factors to support that finding. The court further found that measures less restrictive than confinement had frequently or recently been applied unsuccessfully to Defendant. *Id.* § 40-35-103(1)(C).

Finally, the trial court found that consecutive sentencing in this case was appropriate because Defendant was a "professional criminal who had knowingly devoted his life to

- 12 -

criminal acts as a major source of his livelihood," that he is an "offender whose record of criminal activity is extensive, based upon the record presented to the Court," and he was sentenced for an offense committed while on probation. *Id.* § 40-35-115(b)(1-2), (6). The trial court pointed out:

> We have a 32-year-old man here who has an employment history of just two years. [Defendant] is a gang member and a drug dealer. That's how he gets by, that's how he makes his living. That is clearly borne out in the proof before the Court.

As to count one, the trial court imposed the maximum sentence of twenty-five years, with at least fifteen years to be served at one-hundred percent pursuant to the Drug-Free Zone Act. The trial court also imposed a sentence of eight years for each firearm conviction in counts two and three, "to serve five years by operation of law." The court further ordered count two to run consecutively to count one and concurrently with count three for an effective thirty-three year sentence, with mandatory service of twenty years. The trial court also approved the fine imposed by the jury.

## Analysis

### I. *Denial of Motion to Dismiss Counts of the Presentment*

Defendant argues that the trial court erred by denying his motion to dismiss the firearm offenses in counts two and three of the presentment for failure to charge an offense. He also contends that the trial court erred by failing to dismiss the criminal gang enhancement in count ten because it "fails to include a factual nexus as required by Tenn[essee] Code Ann[otated section] 40-35-121(b)(2)" and thus "fails to state an offense." The State contends the trial court correctly found that conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver within 1,000 feet of a drug-free zone "can serve as the predicate 'dangerous felony' for the firearm offenses," and therefore, counts two and three properly charged an offense. The State also asserts that it was "not required to specify a theory by which it intended to prove each element of the offense;" therefore, the presentment gave proper notice of the gang enhancement in count ten.

An accused is constitutionally guaranteed the right to be informed of the nature and cause of the accusation. U.S. Const. amend. VI, XIV; Tenn. Const. art. I, § 9; *Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000). Our courts have interpreted this constitutional mandate to require an indictment or presentment to "1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy." *Wyatt*, 24 S.W.3d at 324 (citations omitted). Further, an indictment or presentment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person

of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." T.C.A. § 40-13-202. The question of the validity of an indictment or presentment is one of law and, as such, our review is *de novo*. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

*Counts Two and Three*

It is an offense to employ a firearm during the commission of a dangerous felony or the attempt to commit a dangerous felony. T.C.A. § 39-17-1324(b)(1), (2). The State is required to include the underlying dangerous felony as a separate count in the same presentment or indictment to be "tried before the same jury and at the same time as the dangerous felony." *Id*. § -1324(d). There are several offenses enumerated by the firearm statute that can serve as a predicate dangerous felony, including "[a] felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance." *Id*. § -1324(i)(1)(L).

In this case, count two of the presentment alleged that Defendant "unlawfully and knowingly employ[ed] a firearm during the commission of a dangerous felony, to wit, a felony involving the possession with intent to sell a controlled substance . . . in violation of T.C.A. § 39-17-1324." Count three of the presentment alleged that Defendant employed a firearm during the commission of the same dangerous felony after having been previously convicted of felony possession of marijuana with intent to sell in violation of T.C.A. § 39-17-1324. Both counts clearly set forth the predicate felony for the firearm offense and belie Defendant's claim that the presentment "fails to provide proper notice of the predicate dangerous felony that [Defendant] allegedly committed while employing a firearm."

Even if the predicate felony had not been named in counts two and three, the presentment would still be sufficient because it contained "all three of the essential elements of the firearm offense[s], namely, '(1) that the defendant employed a firearm; (2) that the employment was during the commission or attempted commission of a dangerous felony; and (3) that the defendant acted intentionally, knowingly, or recklessly.'" *State v. Duncan*, 505 S.W.3d 480, 488 (Tenn. 2016) (quoting *State v. Fayne*, 505 S.W.3d 362, 369-70 (Tenn. 2014)). Additionally, an indictment charging employment of a firearm during the commission of a dangerous felony is sufficient to provide notice to the defendant without even naming the predicate felony. *Id*. at 489-91. counts two and three adequately apprised the Defendant of the nature and cause of the accusation against him and enabled him to adequately prepare a defense. *Id*. at 491. We also note that "'an indictment which references the statute defining the offense is sufficient and satisfies the constitutional and statutory requirements' for a charging instrument." *Id. at* 488 (quoting *State v. Hammonds*, 30 S.W.3d 295, 300 (Tenn. 2000)).

Defendant contends that the although the statutory definition of a dangerous felony includes "any attempt, as defined in § 39-12-101, to commit a dangerous felony," the

- 14 -

statute "does not include 'conspiracy' to commit a dangerous felony in its enumeration of dangerous felonies." T.C.A. § 39-17-1324(i)(1)(L). Therefore, Defendant asserts that the General Assembly must have deliberately omitted conspiracy from the list of enumerated dangerous felonies and that "[t]o conclude that a conspiracy is a dangerous felony is to expand the statute's coverage beyond its intended scope."

When construing a statute, this court must "'ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *State v. Welch*, 595 S.W.3d 615, 621 (Tenn. 2020) (quoting *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016)). We first examine "the plain language of the statute to determine the legislature's intent," while giving the statute's words their natural and ordinary meaning. *Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn. 2010)). "When those words are clear and unambiguous, we need not consider other sources of information but must simply enforce the statute as written." *Id.* at 249.

We agree with the trial court in this case that conspiracy to possess 26 grams or more of cocaine with intent to sell is "[a] felony involving . . . possession with intent to sell . . . a controlled substance." T.C.A. § 39-17-1324(i)(1)(L). In *Tuttle v. State*, the petitioner was convicted of possession of a firearm during the commission of a dangerous felony to-wit: conspiracy to possess over 300 pounds of marijuana with intent to sell. *Tuttle v. State*, No. M2020-01636-CCA-R3-PC, 2021 WL 6054834, at *2 (Tenn. Crim. App December 21, 2021). Petitioner argued on post-conviction that trial counsel was ineffective for failing to challenge the indictment because it did not allege a proper qualifying predicate felony as conspiracy was not included in the statutory list of enumerated dangerous felonies. This court found:

> The petitioner's argument here is perplexing. He seems to contend that conspiracy to *possess* over 300 pounds of marijuana with *intent* to *sell*, a Class E *felony*, is not a "*felony* involving . . . *possession* with *intent* to *sell* . . . a controlled substance" as defined in Tennessee Code Annotated [section] 39-17-1324(i)(1)(L) (emphasis added). We disagree. It is clear the indictment listed a qualifying, predicate felony as required, and accordingly, trial counsel was not deficient for failing to challenge the indictment. The petitioner is not entitled to relief on this issue.
>
> Related to this argument, the petitioner also contends his conviction for possession of a firearm is void because the indictment fails to state a lawful accusation because conspiracy to possess over 300 pounds of marijuana with intent to sell is not listed as a qualifying, predicate felony in Tennessee Code Annotated [section] 39-17-1324(i)(1)(A)-(M). As discussed above, conspiracy to possess over 300 pounds of marijuana with intent to sell clearly falls within the definition outlined in 39-17-1324(i)(1)(L).

- 15 -

*Id.* at \*6. Likewise in this case, conspiracy to possess 26 grams or more of cocaine with intent to sell clearly falls within the definition of a dangerous felony as enumerated in Tennessee Code Annotated section 39-17-1324(i)(1)(L).

The trial court properly denied Defendant's motion to dismiss counts two and three of the indictment for failure to charge an offense. The presentment gave Defendant proper notice of the firearm offenses, including the predicate dangerous felony for each of the two counts.

*Count Ten*

Count Ten of the presentment alleged that Defendant's charge for conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver within 1,000 feet of a drug-free zone "was subject to enhanced punishment pursuant to T[ennessee] C[ode] A[nnotated section] 40-35-121(b)." The presentment also specified that members of the Tree Top Pirus gang had "engaged in a pattern of criminal gang activity" in that they had prior convictions for the commission of at least two or more felony criminal gang offenses that occurred on separate occasions within five years of each other. The presentment then listed the gang members and their prior offenses.

Defendant argues that count ten fails to allege whether the gang offense was committed (1) at the direction of the criminal gang; (2) in association with the criminal gang; or (3) for the benefit of the criminal gang. He states that "[w]ithout this factual allegation, we cannot know which nexus was found by the Grand Jury, and we cannot be certain that [Defendant] was convicted of what was found by the Grand Jury when it returned the [p]resentment in this case." However, the State was not required in the presentment to "allege the specific theory" by which it intended to prove the nexus between Defendant's gang membership and his criminal offense. *See Hammonds*, 30 S.W.3d at 301. As pointed out by the State, count ten of the presentment was sufficient by its reference to the statute defining the offense. *Duncan*, 505 S.W.3d at 488.

Additionally, the purpose of the gang enhancement statute is to put Defendant on notice that the State is seeking to enhance his sentence based on membership in the listed gang. *See id.* § 40-35-121(g). To enhance a defendant's sentence, the State must prove at trial that "the defendant's alleged gang meets the statutory definition of a 'criminal gang,' which requires a showing that the defendant's organization "'engaged in a pattern of criminal gang activity.'" *Id.* § 40-35-121(a)(1), (g)–(h). Accordingly, the notice provision requires the State to specify the gang members and convictions it will use to show a pattern of criminal gang activity. The State did that in this case, and therefore met the statutory requirements of section 40-35-121. *State v. Shackleford*, 673 S.W.3d 243, 253 (Tenn. 2023). Defendant is not entitled to relief on this issue.

- 16 -

## II.    *Denial of Motion for Mistrial*

Defendant contends that the trial court abused its discretion by denying his motion for a mistrial after the State "read the 'dangerous felony' language of the presentment to the jury."  Defendant further claims that "[i]n the alternative, this [c]ourt should hold that the simultaneous trial requirement of T[ennessee] C[ode] A[nnotated section] 39-17-1324 violates principles of due process."  The State responds that the reading of the presentment to the jury did not require a mistrial.

A trial court's decision to grant or deny a motion for mistrial is within the province of that court.  An appellate court will only disturb a trial court's ruling on the motion when there has been an abuse of discretion by the trial court.  *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009).  A trial court abuses its discretion when it "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party."  *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

A trial court should declare a mistrial "only where there is a 'manifest necessity.'"  *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)).  "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'"  *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004) (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)).  A mistrial should be declared "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict."  *Williams*, 929 S.W.2d at 388.  The defendant bears the burden of establishing that there was a manifest necessity for a mistrial.  *Id.*

In this case, Defendant argues that the reading of the presentment to the jury, that included the phrase "dangerous felony," and "perhaps even the requirement that the 'employment' charge be tried simultaneously with the predicate felony, likely ha[d] a deleterious and prejudicial effect against [Defendant] and his right to a fair trial."  However, in *State v. Bane*, 853 S.W.2d 483, 484 (Tenn. 1993), the supreme court held that the reading of the indictment to the jury is an "appropriate and proper procedure."  "The indictment at best is a mere accusation to inform the jury of the charges against the defendant.  It raises no presumption of guilt.  It is purely hearsay, being merely the conclusion or the opinion of the grand jury based on ex parte evidence."  *Id*. (citing *State v. Onidas*, 635 S.W.2d 516, 517 (Tenn. 1982)).

Additionally, the trial court here instructed the jury that "[t]he presentment in this case is the formal written accusation bringing criminal charges against [Defendant].  It is not evidence against the defendant and does not create any inference of guilt."  Jurors are presumed to follow the instructions given to them by the trial court.  *Henley v. State*, 960 S.W.2d 572, 581 (Tenn. 1997).  There is nothing in the record to suggest that the prosecutor

"did anything other than simply read the indictment to the jury." *State v. Barber*, No. 02C01-9707-CR-00255, 1998 WL 418031, at *2 (Tenn. Crim. App. July 24, 1998). Therefore, the trial court did not err by allowing the indictment to be read to the jury. Defendant is not entitled to relief on this issue.

As for Defendant's one-sentence argument that the simultaneous trial requirement of Tennessee Code Annotated section 39-17-1324 violates principles of due process, we find that this issue is waived. Defendant fails to cite any authority and offers no argument as to how the simultaneous trial requirement violates principles of due process. Tennessee Rule of Appellate Procedure 27(a)(7) requires that the appellant set forth an argument for each issue, along with "the reasons therefor[e], including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on[.]" Tenn. R. App. P. 27(a)(7). Similarly, Rule 10(b) of the Rules of this court states plainly that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Accordingly, Defendant's due process claim is waived.

### III.     *Violation of Rule of Sequestration*

Defendant asserts that the trial court erred by exempting Investigator Jinks from the rule of sequestration during Lola Garrett's testimony. The State argues that the trial court did not abuse its discretion in finding that Investigator Jinks needed to hear Ms. Garrett's testimony to "form an expert opinion that was essential to the State's case." The State further contends that any alleged error does not require a new trial because a violation of the rule of sequestration "merely implicates a witness's credibility – not the admissibility of the witness's testimony."

A trial court has broad discretion in controlling the course and conduct of a trial. *State v. Davidson*, 509 S.W.3d 156, 193-94 (Tenn. 2016). This court reviews a trial court's decisions for abuse of discretion. *Id.* "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015) (quoting *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014)). Tennessee Rule of Evidence 615, often referred to as the Rule of Sequestration, provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule

does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

The purpose of this rule "is to prevent a witness from changing or altering his or her testimony based on testimony heard or facts learned from other testifying witnesses." *State v. Bane*, 57 S.W.3d 411, 423 (Tenn. 2001). In *Bane* the supreme court recognized that:

the dangers Rule 615 is intended to prevent generally do not arise with regard to expert witnesses in any proceeding. In fact, the rules of evidence provide that an expert witness may testify and base an opinion on evidence or facts made known to the expert *at or before* a hearing and the facts need not be admissible at trial. Moreover, an expert witness often may need to hear the substance of the testimony of other witnesses in order to formulate an opinion or respond to the opinions of other expert witnesses. In short, allowing an expert witness to remain in the courtroom as an "essential person" generally does not create the risk that the expert will alter or change factual testimony based on what is heard in the courtroom.

*Id.* (citations omitted).

In this case, Defendant invoked the rule of sequestration at the beginning of trial, and the trial court ordered sequestration of the witnesses. However, Investigator Thurman was permitted to remain in the courtroom as the State's designated witness. Later, the State requested that Investigator Jinks be exempted from the rule of sequestration during Ms. Garrett's testimony so that he would be able to explain some of the terminology used in her testimony and that hearing her testimony would "aide him in forming his opinion as to the involvement of the Tree Top Pirus in the drug conspiracy." Defendant did not dispute that Investigator Jinks was an expert witness; however, he argued that Investigator Jinks needed to be sequestered because he was also a fact witness and could adjust his testimony "to what [Ms. Garrett] says."

The trial court rejected Defendant's argument, finding:

Now, Investigator Jinks' situation is somewhat unique because he is both a fact witness and potentially an expert witness at the same time in this case. However, in the proof that I've heard in this trial in the past, his role as a fact witness is somewhat limited.

- 19 -

I think his greater utility in the past trials has been the opinion that he renders in his role as an expert witness. I do think, and I think this has been borne out in prior trials, that it is important for him to hear what some of these informant witnesses are saying, the terminology that they use, and I think that has been helpful in helping him form opinions and also explain those opinions to the jury.

He has been sequestered up until this point. The Court's ruling is limited to allowing him to hear the testimony of Ms. Garrett. So the defense objection is noted, but I will allow Investigator Jinks to hear the testimony of Ms. Garrett when she testifies today.

We conclude that the trial court did not abuse its discretion in allowing Investigator Jinks to remain in the courtroom during Ms. Garrett's testimony. His testimony as an expert witness was shown to be "essential to the presentation of the [State's] cause," and he was therefore exempt from the rule of sequestration. *See* Tenn. R. Evid. 615, Advisory Comm'n Comments; *Bane*, 57 S.W.3d at 423; *State v. Jordan*, 325 S.W.3d 1, 40 (Tenn. 2010). Defendant has not shown or even alleged that Investigator Jinks improperly changed his testimony after hearing Ms. Garrett testify. Investigator Jinks testified that he was present during the December 2017 search of Mr. Arnold's apartment but he was not present at the search of Mr. Crowe's house. It was Investigator Jinks' expert opinion, based on Ms. Garrett's testimony, that Mr. Crowe's house would also have been a "trap house" used for selling drugs. This was borne out by other evidence presented at trial that drugs were being sold out of Mr. Crowe's house.

Further, Defendant has not identified any prejudice that he suffered due to Investigator Jinks' presence during Ms. Garrett's testimony. Although Defendant argues that Investigator Jinks should have remained sequestered because he was also a fact witness, he cites no authority for this argument, nor are we aware of any such authority. We agree with the trial court that Investigator Jinks' testimony as a fact witness was somewhat limited. Moreover, we agree with the State that Investigator Jinks' presence in the courtroom during Ms. Garrett's testimony at most called into question his credibility, but would not have rendered his testimony inadmissible or constitute grounds for a new trial. *Jordan*, 325 S.W.3d at 39-40 (citing *Navarrete v. State*, 656 S.E.2d 814, 820 (Ga. 2008) ("A violation of the rule of sequestration generally does not affect the admissibility of the testimony, but may impact on the credibility of the offending witness.")). Defendant is not entitled to relief on this issue.

## IV. *Authentication of Text Messages*

Defendant argues that the trial court abused its discretion by admitting the text messages in this case because the State failed to establish that Investigator Jinks "had the requisite personal knowledge to testify as to the contents of the cell[ ]phones and could not

authenticate the messages." More specifically, he contends that Investigator Jinks had no personal knowledge as to who possessed the cell phones at the time the text messages were sent and "had no knowledge of the conduct described within the messages, or if it even occurred." The State counters that Investigator Jinks properly authenticated the Cellebrite reports he prepared containing the data extracted from Defendant's phones, including the text messages.

The authentication of evidence is governed by Tennessee Rule of Evidence 901. Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Both Rule 901 and the common law designate the trial court as the "arbiter of authentication issues," and, thus, the trial court's ruling will not be disturbed on appeal absent a showing that the trial court clearly abused its discretion. *See* Tenn. R. Evid. 901, Advisory Comm'n Comments; *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423, 433 (Tenn. 2018); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Rule 901 provides in pertinent part as follows:

(b) Illustrations. — By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of Witness With Knowledge. Testimony that a matter is what it is claimed to be.

. . .

(4) Distinctive Characteristics and the Like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with other circumstances.

. . .

(9) Process or System. Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

- 21 -

Tenn. R. Evid. 901(b). "Subsection (b)(4) simply makes common sense. Without drawing the boundaries of practical possibilities, the rule allows proof to the court of a myriad of distinctive characteristics that may convince the judge that a questioned document is authentic enough to let the jury consider it." *Id.*, Advisory Comm'n Comments. The Advisory Commission Comments also provide that "[s]ubsection (b)(9) treats authentication of computer documents. All that the lawyer need do is introduce evidence satisfying the court that the computer system produces accurate information." *Id.*, Advisory Comm'n Comments; *State v. Holmes*, No. E2021-01489-CCA-R3-CD, 2022 WL 16736968, at *11 (Tenn. Crim. App. Nov. 7, 2022), *perm. app. denied* (Tenn. Feb. 8, 2023).

In this case, we find that the trial court did not abuse its discretion in admitting the Cellebrite data reports containing the text messages extracted from Defendant's cell phones. Investigator Jinks testified that he was certified by Cellebrite to use a program called "Physical Analyzer" to extract data from cell phones and translate it into an "easily navigable, readable format." He had received "multiple trainings" and "through his experience" learned "that a lot of that data has to be analyzed with an eye of - - understanding that drug distributors and drug traffic organizations use coded language." Investigator Jinks testified that he obtained a search warrant and downloaded information from three cell phones taken from Defendant during traffic stops on three different dates in 2018. He testified concerning the content of text messages exchanged between Defendant, certain co-defendants, and other individuals concerning the sale of drugs. Investigator Jinks also testified that the coded language specific to the Tree Top Pirus gang was prevalent throughout certain text messages extracted from the phones.

Investigator Jinks' testimony was sufficient to show that the Cellebrite data extraction reports containing Defendant's text messages were what the State purported them to be. Defendant's argument that Investigator Jinks had insufficient personal knowledge of the contents of the text messages, who possessed the cell phones at the time the messages were sent, and knowledge of the content described within the messages, or whether the messages even occurred is irrelevant to the determination of whether the text messages in Cellebrite data extraction report were properly authenticated under Rule 901. *See State v. Thomas*, No. E2017-02378-CCA-R3-CD, 2019 WL 1224581, at *3 (Tenn. Crim. App. Mar. 15, 2019). This is a question for the jury. Defendant is not entitled to relief on this issue.

## V. *Sufficiency of the Evidence*

Defendant contends that the evidence was insufficient to support his conviction for conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver within 1,000 feet of a drug-free zone. The State asserts that the jury could have easily concluded that Defendant conspired to sell the cocaine within 1,000 feet of a drug-free zone. The State further asserts that "[a]ccomplice testimony, photographic and video evidence, and

cell phone records establish that [Defendant] was not only a participant but also the leader of this drug conspiracy."

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

Conspiracy requires that "two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." T.C.A. § 39-12-103(a). Some overt act in the pursuance of the conspiracy must be proved to have been done by the defendant or another member of the conspiracy. *Id*. § 39-12-103(d).

To prove the existence of a conspiratorial relationship, the State may show that a "mutual implied understanding" existed between the parties. *State v. Shropshire,* 874

S.W.2d 634, 641 (Tenn. Crim. App. 1993). A formal agreement is not necessary. *Id.* The conspiracy may be demonstrated by circumstantial evidence and the conduct of the parties while undertaking the illegal activity. *Id.* "'Conspiracy implies concert of design and not participation in every detail of execution.'" *Id.* (quoting *Randolph v. State,* 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978)).

Possession with intent to sell a controlled substance includes the following elements: (1) that the defendant possessed a controlled substance with intent to sell it; and (2) that the defendant acted knowingly. T.C.A. § 39-17-417(a)(b). "Sale" is a bargained-for offer and acceptance and an actual or constructive transfer or delivery of the controlled substance. *See State v. Holston,* 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). A "controlled substance" includes any drug, substance, or immediate precursor in Schedules I through VIII of Tennessee Code Annotated section 39-17-403 to Tennessee Code Annotated section 39-17-416. *See* T.C.A. § 39-17-402(4). Crack cocaine is a Schedule II controlled substance. *Id*. § 39-17-408(a), (b)(4). A person acts knowingly with respect to certain conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. *Id*. § 39-11-302(b). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.*

The evidence in this case, viewed in a light most favorable to the State, establishes that Defendant and his co-defendants conspired to possess with intent to sell 26 grams or more of cocaine within 1,000 feet of a drug-free zone. Defendant approached Mr. Arnold and asked to use his apartment to sell drugs, and Mr. Arnold agreed to receive cocaine from Defendant daily in exchange for using the residence. Both Defendant and Mr. Tate sold drugs out of Mr. Arnold's apartment. Likewise, Defendant approached Ms. Garrett, an admitted drug addict, after she and Mr. Smith began living in Mr. Crowe's house and asked to use the residence to sell drugs. Mr. Crowe, also an admitted drug addict, received cocaine in exchange for Defendant's use of his house. Thereafter, Defendant, Ms. Garrett, Mr. Smith, Mr. Tate, Mr. Jackson, Mr. Clark, and Mr. Nyane sold drugs out of the residence.[3] Mr. Crowe specifically testified that Defendant gave Ms. Garrett, Mr. Smith, Mr. Tate, and Mr. Jackson packs of drug to sell, and Mr. Crowe's role was to sit by the door and direct others to Defendant. Mr. Crowe testified that Defendant sat at a table and sold cocaine and marijuana out of Mr. Crowe's house, and Defendant cooked additional cocaine in the microwave if he ran out. Ms. Garrett testified that when Defendant was present at Mr. Crowe's house, everyone came to him.

During the first search of Mr. Arnold's apartment, investigators found .44 grams of crack cocaine, various drug paraphernalia, a weapon, and boxes of ammunition for other types of guns. During a second search of the apartment, Investigators recovered 29.13

---

[3] We recognize that the jury in considering the drug conspiracy in count one found that Mr. Crowe's residence was not used to "house" cocaine.

grams of powder cocaine, 33.41 grams of crack cocaine, various drug paraphernalia, weapons, including an assault rifle, ammunition, and cash. During a later traffic stop, Mr. Clark and Mr. Jackson were found in possession of firearms, 76.12 grams of powder cocaine, 4.57 grams of crack cocaine, currency, and digital scales. Mr. Nyane's residence was also searched, and investigators recovered an assault rifle and several types of ammunition.

Investigator Jinks testified about the numerous text messages exchanged between Defendant and his associates concerning the manufacture, sale, and delivery of cocaine, as well as prices, sources, and the quality of cocaine. After Mr. Arnold's arrest, there were also text messages exchanged between Defendant and Mr. Tate about whether anyone had posted videos or pictures from inside Mr. Arnold's residence that day. Defendant later indicated that one picture showed him inside the residence and Mr. Tate replied, "It's gone." Defendant also checked to see if he had an outstanding warrant but did not find anything, and he and Mr. Tate discussed not helping Mr. Arnold post bond. In addition to the text messages, Investigator Jinks also retrieved pictures and videos from the three cell phones depicting Defendant and his co-conspirators at Mr. Arnold's apartment and Mr. Crowe's house with weapons and large sums of currency. One video showed Defendant sitting in a chair in Mr. Arnold's apartment within feet of where drugs and a firearm were recovered by police later that same day.

Although Defendant contends that there was insufficient evidence to support a finding that the conspiracy occurred within 1,000 feet of a drug-free zone, Ms. Roach testified that Mr. Arnold's residence was located within 1,000 feet of a Boys and Girls Club which provided daycare services, and Mr. Crowe's residence was within 1,000 feet of a park and a daycare.

Based on the evidence, a rational jury could have concluded beyond a reasonable doubt that Defendant and his co-defendants conspired to sell 26 grams or more of cocaine within 1,000 feet of a drug-free zone and that the co-conspirators took several overt acts in furtherance of the conspiracy. Defendant asserts that there was no proof of a connection between him and Mr. Clark and Mr. Jackson who were arrested after a traffic stop in 2018 and that he was not present during the searches of Mr. Arnold's and Mr. Crowe's residences. He further asserts that there was no fingerprint evidence nor proof that the drugs and weapons were recovered "on or near" him. However, the jury, by its verdicts, resolved any conflicts in this evidence in favor of the State. *See Campbell,* 245 S.W.3d at 335. Defendant is not entitled to relief.

VI.     *Violation of Double Jeopardy and the Doctrine of Collateral Estoppel*

Defendant argues that the jury's finding of the gang enhancement in count ten of the presentment violated double jeopardy and the doctrine of collateral estoppel because the jury found that he was not a criminal gang member during the guilt phase of the trial.

Defendant concedes that he failed to raise this issue at trial and in his motion for new trial. However, he requests that we review this issue under plain error. The State responds that there was no breach of a clear and unequivocal rule of law, and thus, there was no plain error.

To demonstrate plain error, Defendant must show that: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was violated; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)). "[A]n appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020).

Regarding the second, third and fifth plain error factors, we conclude that Defendant has not established a violation of a clear and unequivocal rule of law, that a substantial right was affected, or that consideration of the error is necessary to do substantial justice. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states, "No person shall … be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Both clauses provide three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

In *Massengill v. Scott,* our supreme court summarized the related doctrines of res judicata and collateral estoppel as follows:

> The doctrine of collateral estoppel or estoppel by judgment is an extension of the principle of res judicata, and is generally held to be applicable only when it affirmatively appears that the issue involved in the case under consideration has already been litigated in a prior suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment. . . . .
>
> Res judicata bars a second suit between the same parties and their privies on the same cause of action as to all issues which were or could have been litigated in the former suit. Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were

actually litigated and determined in the former suit. . . . To sustain a plea of collateral estoppel it must be shown, inter alia, that the issue sought to be concluded not only was litigated in the prior suit but was necessary to the judgment in that suit.

738 S.W.2d 629, 631–32 (Tenn. 1987) (citation omitted); *see also State v. Thompson*, 285 S.W.3d 840, 855 (Tenn. 2009). "'Once an issue has been actually or necessarily determined by a court of competent jurisdiction, the doctrine of collateral estoppel renders that determination conclusive on the parties and their privies in subsequent litigation, even when the claims or causes of action are different.'" *Gibson v. Trant,* 58 S.W.3d 103, 113 (Tenn. 2001) (quoting *State ex rel. Cihlar v. Crawford,* 39 S.W.3d 172, 178–79 (Tenn. Ct. App. 2000)).

The principle of collateral estoppel, when used defensively by a criminal defendant, *see State v. Scarbrough,* 181 S.W.3d 650, 659 (Tenn. 2005) (stating that the prosecution may not use collateral estoppel offensively), may have constitutional double jeopardy implications. The [c]ourt added that "a defendant in a criminal case may assert collateral estoppel by relying on an acquittal in a first prosecution to bar the litigation of those facts in a later prosecution for a different offense." *Id.* at 655 (citing *Ashe v. Swenson,* 397 U.S. 436, 443–47 (1970)). The [c]ourt concluded that "a defendant's reliance on the collateral estoppel doctrine in such circumstances 'is embodied in the Fifth Amendment guarantee against double jeopardy.'" *Id.* (quoting *Ashe*, 397 U.S. at 445).

*State v. Vann*, No. E2009-01721-CCA-R9CD, 2011 WL 856967, at *9 (Tenn. Crim. App. Mar. 11, 2011). Our supreme court has further acknowledged that the doctrine of collateral estoppel has only "been recognized as a part of our criminal jurisprudence for a relatively short period of time." *Thompson*, 285 S.W.3d 840 at 855.

In this case, as argued by the State, the jury's finding in the bifurcated gang enhancement proceeding that Defendant was a criminal gang member does not violate double jeopardy. Jeopardy attached before the jury was sworn in before the guilt phase of the trial, and the bifurcated proceeding was not a "second prosecution for the same offense." *See Thompson*, 285 S.W.3d at 847; *State v. Harbison*, 539 S.W.3d 149, 167 (Tenn. 2018). It "was an extension of the actual guilt phase of the trial on the underlying criminal offenses." *State v. Bonds*, 502 S.W.3d 118, 151 (Tenn. Crim. App. 2016); *see also Nash*, 294 S.W.3d at 551 ("It is settled that two-stage proceedings, such as those provided for in capital cases and DUI cases, do not pose a double jeopardy problem."). Defendant was not "twice" put in jeopardy for the same offense concerning the gang enhancement in count ten. U.S. Const. V, XIV; Tenn. Const. art. I, § 10.

As to the doctrine of collateral estoppel, we agree with the State that this is a novel argument and therefore, cannot be the basis for granting plain error relief. As set forth above, our supreme court has noted that the doctrine of collateral estoppel has only "been recognized as a part of our criminal jurisprudence for a relatively short period of time." *Thompson*, 285 S.W.3d at 848. It does not appear that any Tennessee cases have addressed the doctrine of collateral estoppel in the context of bifurcated gang enhancement proceedings. *See State v. Fusco*, 404 S.W.3d 504, 532, 535-36 (Tenn. Crim. App. 2012) (declining to find a breach of a clear and unequivocal rule of law on an issue of first impression).

Even if this were a proper basis for considering plain error relief, the doctrine of collateral estoppel has no application in this case because the jury's special verdict during the guilt phase of the trial concerning the gang membership of the co-conspirators was not a "final judgment." *See State v. Huskey*, 66 S.W.3d 905, 927-29 (Tenn. Crim. App. 2001); *cf. United States v. Console*, 13 F.3d 641, 664-65 (3d Cir. 1993) (special verdicts are not "final judgments" or "necessary" to a final judgment). We further agree with the State that even if the jury rendered inconsistent verdicts during the guilt and penalty phases, this is not a ground for reversal. *See Davis*, 466 S.W.3d at 77 ("We continue to agree with the significant majority of jurisdictions that inconsistent jury verdicts are not a basis for relief."). Defendant is not entitled to relief on this issue.

### VII. *Sentencing Under the 2020 Amendments to the Drug-Free Zone Act*

Defendant contends that the Criminal Savings Statute ("Savings Statute") set out in Tennessee Code Annotated section 39-11-112, requires retroactive application of the 2020 amendments to the Drug-Free Zone Act as to his conviction in count one for conspiracy to possess 26 grams or more of cocaine with intent to sell or deliver within 1,000 feet of a drug-free zone. The State argues that the trial court properly sentenced Defendant under the law in effect at the time of the offenses.

To decide which version of the Drug-Free Zone Act ("the Act") applies to Defendant's drug conspiracy conviction, we must interpret its language. Issues involving statutory construction present questions of law which are reviewed de novo with no presumption of correctness. *State v. Robinson*, 676 S.W.3d 580, 584 (Tenn. 2023); *Kampmeyer v. State*, 639 S.W.3d 21, 23 (Tenn. 2022); *State v. Keese*, 591 S.W.3d 75, 78-79 (Tenn. 2019); *State v. Gibson,* 506 S.W.3d 450, 455 (Tenn. 2016); *State v. Dycus*, 456 S.W.3d 918, 924 (Tenn. 2015). We determine legislative intent from the plain language of the statute, "read in context of the entire statute, without any forced or subtle construction which would extend or limit its meaning." *State v. Cauthern*, 967 S.W.2d 726, 735 (Tenn. 1998) (quoting *State v. Davis*, 940 S.W.2d 558, 561 (Tenn. 1997)). When a statute is plain and unambiguous, "we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Davis v. State*, 313 S.W.3d 751, 762 (Tenn. 2010); *see also Keese*, 591 S.W.3d at 79. In the event

of a conflict, a more specific statutory provision takes precedence over a more general provision. *Welch*, 595 S.W. 3d at 622; *see also Cauthern*, 967 S.W.2d at 735. "Generally, statutes are presumed to apply prospectively in the absence of clear legislative intent to the contrary." *State v. Thompson*, 151 S.W.3d 434, 442 (Tenn. 2004); *Cauthern*, 967 S.W.2d at 735. "The legislature may limit a new sentencing enactment to prospective application." *Simpson v. State,* No. 01-C-019203-CR00098, 1992 WL 335937, at *3 (Tenn. Crim. App. Nov. 18, 1992). Indeed, when construing a more recent statute in conjunction with pre-existing legislation, "we presume that the legislature has knowledge of its prior enactments and is fully aware of any judicial constructions of those enactments." *Davis*, 313 S.W.3d at 762; *see also Welch,* 595 S.W.3d at 626.

Although not published with the rest of the statute in the Tennessee Code Annotated per standard practice, a statute's enabling provision is an expression of the General Assembly's intent regarding the statute. *Carter v. State,* 952 S.W.2d 417, 491 n.5 (Tenn. 1997); *see Cauthern,* 967 S.W.2d at 735 ("[w]e conclude that the specific enabling provision of the 1993 act, which clearly states that the amendment applies to all offenses committed on or after July 1, 1993, controls").

At issue here are the amendments to Tennessee Code Annotated section 39-17-1324. As previously stated, it is unlawful for a defendant to knowingly possess a controlled substance with the intent to sell, deliver, or manufacture it. T.C.A. § 39-17-417(a)(4). From September 1, 2017, through September 30, 2018, the time of the commission of the offense, the Act was triggered when a drug offense occurred within 1,000 feet of a designated drug-free zone. During that time, the Act provided in relevant part:

> A violation of § 39-17-417, or a conspiracy to violate the section, that occurs on the grounds or facilities of any school or within *one thousand feet (1,000')* of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park *shall* be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation.

*Id.* § 39-17-432(b)(1) (2014) (emphasis added). A defendant convicted of violating subsection (b), "who is within the prohibited zone of a preschool, childcare center, public library, recreational center or park shall not be subject to additional incarceration as a result of this subsection (b) but shall be subject to the additional fines imposed by this section." *Id.* § 39-17-432(b)(3) (2014). A defendant sentenced under the prior version of the Act was also "required to serve at least the minimum sentence for the defendant's appropriate range of sentence." *Id.* § 39-17-432(c) (2014).

The Act was subsequently amended to afford trial courts discretion in applying the sentence classification enhancement and reduced the distance for the enhancement from 1,000 feet to 500 feet of a drug-free zone's real property:

A violation of § 39-17-417, or a conspiracy to violate the section, *may* be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) if the violation or the conspiracy to violate the section occurs:

(A) On the grounds or facilities of any school; or

(B) Within *five hundred feet* (*500'*) of or within the area bounded by a divided federal highway, whichever is less, the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, public library, recreational center, or park.

*Id.* § 39-17-417(b)(1) (2020) (emphasis added). Under the amended Act, a defendant sentenced for violation of subsection (b) is no longer required to serve at least the minimum sentence. *Id.* § 39-17-432(c)(1) (2020). That requirement is now a presumption that can be overcome:

There is a rebuttable presumption that a defendant is not required to serve at least the minimum sentence for the defendant's appropriate range of sentence. The rebuttable presumption is overcome if the court finds that the defendant's conduct exposed vulnerable persons to the distractions and dangers that are incident to the occurrence of illegal drug activity.

*Id.* § 39-17-417(c)(2) (2020).

In general, "a criminal offender must be sentenced pursuant to the statute in effect at the time of the offense." *Keese*, 591 S.W.3d at 82 (quoting *State v. Smith,* 893 S.W.2d 908, 919 (Tenn. 1994)). "When a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense." T.C.A. § 39-11-112 (Savings Statute). "The 'exception' to the [S]avings [S]tatute is when 'the subsequent act provides for a lesser penalty, [in which case] any punishment imposed shall be in accordance with the subsequent act.'" *State v. Sherman*, No. E2006-01226-CCA-R3-CD, 2007 WL 2011032, at *4 (Tenn. Crim. App. July 12, 2007), *aff'd*, 266 S.W.3d 395 (Tenn. 2008); *see State v. Menke,* 590 S.W.3d 455, 468-70 (Tenn. 2019) (stating that because amendments to the theft grading statute effectively changed and provided for a lesser penalty than its previous version, the Savings Statute was satisfied, and the amended version was applicable where the offense occurred before the amendment's effective date but defendant was sentenced after the effective date); *cf. Keese,* 591 S.W.3d at 84 (holding that the Savings Statute was inapplicable where defendant was convicted and sentenced before effective date of the amendments to the theft grading statute); *State v. Tolle,* 591 S.W.3d 539, 545-46 (Tenn. 2019) (stating that the

Savings Statute did not apply to authorize trial court to sentence defendant to a reduced grade of the convicted offense under amendment to theft grading statute upon revocation of defendant's probation). Furthermore, "a clear legislative directive regarding retroactive application is not required for a defendant to benefit from the lesser punishment imposed by the subsequent act." *Menke,* 590 S.W.3d at 470.

In this case, the legislature's intent of limiting application to offenses occurring on or after September 1, 2020, is expressed unambiguously in the language of the enabling provision for the Act which states, "This act shall take effect September 1, 2020, the public welfare requiring it, and applies to offenses committed on or after that date." 2020 Tenn. Pub. Acts, ch. 803, § 12. *See also State v. Linville*, 647 S.W.3d 344, 346 n.2 (Tenn. 2022) ("The 2020 amendment [to T.C.A. §39-17-432] applied to offenses that occurred on or after September 1, 2020."). This specific language of the enabling provision is essentially the same as the enabling language our supreme court interpreted in *Cauthern* to supersede the Savings Statute. *Cauthern*, 967 S.W.2d at 735. Defendant committed the offenses during a period of time from September 1, 2017, through September 30, 2018. Thus, by its terms, the September 2020 amendments to the Act do not apply to Defendant. *See Catron v. State,* No. 03C01-9310-CR-00358, 1994 WL 176971, at *1 (Tenn. Crim. App., May 11, 1994) (holding that the Sentencing Reform Act of 1989 was not retroactively applicable to petitioner where the language of the statute and the enabling legislation plainly states that the statute applies to offenders who are sentenced after the effective date); *see also State ex rel. Crum v. McWherter,* No. 02-C01-9108-CC-00181, 1992 WL 99029, at *2 (Tenn. Crim. App., May 13, 1992); *Moree v. State*, No. E2005-02302-CCA-R3-HC, 2007 WL 465113, at *1 (Tenn. Crim. App. Feb. 13, 2007).

This court has repeatedly rejected the argument that the Savings Statute requires retroactive application of the 2020 amendments to the Drug-Free Zone Act. *State v. Hamlin*, E2022-00139-CCA-R3-CD, 2023 WL 177105, at *5 (Tenn. Crim. App. Jan. 10, 2023) *perm. app. denied* (Tenn. May 10, 2023); *see State v. McKenzie*, No. E2021-00445-CCA-R3-CD, 2022 WL 2256338, at *10 (Tenn. Crim. App. June 23, 2022), *perm. app. denied* (Tenn. Dec. 2, 2022); *State v. Dowell*, No. E2020-01641-CCA-R3-CD, 2022 WL 1115577, at *20 (Tenn. Crim. App. Apr. 14, 2022), *perm. app. denied* (Tenn. Oct. 4, 2022).

Here, the trial court properly sentenced Defendant in count one under the prior Act in accordance with the specific enabling provision of the Act. Defendant committed the relevant offense during a period of time from September 1, 2017, through September 30, 2018. Conspiracy to possess 26 grams or more of cocaine with intent to sell within 1,000 feet of a drug-free zone is a Class B felony. *See* T.C.A. §§ 39-17-417(c), (i)(5). A felony drug offense committed within 1,000 feet of a daycare does not subject Defendant to additional incarceration; however, Defendant's sentence in count one was increased from a Class B to a Class A felony due to the application of the criminal gang enhancement. *Id*. §§ 39-17-432(b)(3); 40-35-121(b)(1). For those reasons, Defendant faced a sentencing range of fifteen to twenty-five years. *Id*. § 40-35-112(a)(2) (2019). The trial court properly

sentenced Defendant as a Range I offender to twenty-five years with at least the first fifteen years of the sentence to be served at one hundred percent. Defendant is not entitled to relief.

*VIII.    Resentencing Under the 2022 Amendments to the Drug-Free Zone Act*

Finally, Defendant requests that we remand his case to the trial court for resentencing in count one under the 2022 Amendments to the Drug-Free Zone Act. The State responds that "criminal defendants may only seek relief under the 2022 amendments in the trial court," and "may not seek this relief in the first instance on appeal."

Tennessee Code Annotated section 39-17-432 subsection (h), which became effective April 29, 2022, allows defendants sentenced for offenses committed before September 1, 2020, to file a motion for resentencing under the amended version of the Act. Subsection (h) specifically provides:

> (1) Notwithstanding subsection (d) or (e) or any other law to the contrary, the court that imposed a sentence for an offense committed under this section that occurred prior to September 1, 2020, may, upon motion of the defendant or the district attorney general or the court's own motion, resentence the defendant pursuant to subsections (a)-(g). The court shall hold an evidentiary hearing on the motion, at which the defendant and district attorney general may present evidence. The defendant shall bear the burden of proof to show that the defendant would be sentenced to a shorter period of confinement under this section if the defendant's offense had occurred on or after September 1, 2020. The court shall not resentence the defendant if the new sentence would be greater than the sentence originally imposed or if the court finds that resentencing the defendant would not be in the interests of justice. In determining whether a new sentence would be in the interests of justice, the court may consider:
>
>> (A) The defendant's criminal record, including subsequent criminal convictions;
>>
>> (B) The defendant's behavior while incarcerated;
>>
>> (C) The circumstances surrounding the offense, including, but not limited to, whether the conviction was entered into pursuant to a plea deal; and
>>
>> (D) Any other factors the court deems relevant.

(2) If the court finds that the defendant is indigent, using the criteria set out in § 40-14-202(c), the court shall appoint counsel to represent the defendant on such a motion.

(3) The court shall not entertain a motion made under this subsection (h) to resentence a defendant if:

(A) A previous motion made under this subsection (h) to reduce the sentence was denied after a review of the motion on the merits;

(B) Resentencing the defendant to a shorter period of confinement for this offense would not reduce the defendant's overall sentence or lead to an earlier release; or

(C) The defendant has previously applied to the governor for a grant of executive clemency on or after December 2, 2021, for the same offense and has been denied.

(4) This subsection (h) does not require a court to reduce any sentence pursuant to this section.

T.C.A. § 39-17-432(h)(1)-(4). In *Hamlin*, this court concluded that "[t]he 2022 amendments plainly state that a motion for resentencing is to be directed to 'the court that imposed a sentence.'" *Hamlin*, 2023 WL 177105, at *6 (citing T.C.A. § 39-17-432(h)(1)). The motion for resentencing may be filed by the defendant, the District Attorney General, or raised sua sponte by the sentencing court. *Id.* However, "[n]othing in the amendments contemplates such motion to be initiated at the behest of this court." *Id.* This court's jurisdiction is "appellate only," and we are "without statutory authority to compel the trial court, the court which originally sentenced [Defendant], to consider whether resentencing is appropriate pursuant to the 2022 amendments." *Id.*; T.C.A. § 16-5-108(a)(1). Defendant may file a motion seeking resentencing under the 2022 amendments in the trial court when this appeal is no longer pending. He is not entitled to relief from this court.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JILL BARTEE AYERS, JUDGE